IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
─────────────────────────────────────

MICHAEL T. KARAM,

               Plaintiff,         14-CV-6076

      -v-                DECISION AND
                          ORDER

CAROLYN W. COLVIN,
Commissioner OF Social Security,

               Defendant.
─────────────────────────────────────

Michael Karam ("plaintiff") brings this action under Titles II and XVI of the Social Security Act ("the Act"), claiming that the Commissioner of Social Security (the "Commissioner" or "defendant") improperly denied his applications for disability insurance benefits ("DBI") and supplemental security income ("SSI").

Currently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, plaintiff's motion is denied and defendant's motion is granted.

### **PROCEDURAL HISTORY**

On January 26, 2011, plaintiff filed an application for DIB and SSI alleging disability as of April 28, 2006 due to post-traumatic stress disorder ("PTSD"), carpal tunnel syndrome, arthritis, depression, anxiety, rage, and pain in his left side, wrist, and ankle. Administrative Transcript ("T.") 141-150. Following a denial of that application on May 31, 2011, plaintiff

testified at a hearing held at his request on September 5, 2012 before administrative law judge ("ALJ") Bruce Fein.  T. 27-64.

Considering the case *de novo* and applying the five-step analysis contained in the Social Security Administration's regulations (*see* 20 C.F.R. §§ 404.1520, 416.920), the ALJ made the following findings: (1) plaintiff last met the insured status requirements of the Act through September 30, 2006; (2) he had not engaged in substantial gainful activity since April 18, 2006, the date of the onset of his alleged disability; (3) his degenerative disc disease, depressive disorder NOS and  PTSD were severe impairments; (4) his impairments, singly or combined, did not meet or medically equal the severity of any impairments listed in 20 CFR Part 404, Subpart P, Appendix 1; and (5) plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: he can lift and carry up to 20 pounds occasionally and 10 pounds frequently; he can sit for at least six hours and stand or walk for at least six hours in an eight-hour work day; he can perform the postural limitations of crouching and stooping occasionally; and he can have contact with supervisors occasionally.  T. 14-16.

With respect to finding number four, the ALJ found that plaintiff's physical and mental impairments did not meet or equal the criteria for any impairment in Listings 12.04, 12.06, 12.08, and 12.09.  T. 15. The ALJ further found that plaintiff's mental

impairments did not meet the "paragraph B" criteria, which requires at least two marked limitations or one marked limitation and repeated episodes of decompensation.  T. 16.

An unfavorable decision was issued by the ALJ, the Appeals Council denied plaintiff's request for review.  T. 1.  This action ensued.

## DISCUSSION

## I.   General Legal Principles

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Section 405(g) provides that the District Court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (2007).  The section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record.

When determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "'to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir.1999), *quoting Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam).  Section 405(g) limits the

scope of the Court's review to two inquiries: whether the Commissioner's findings were supported by substantial evidence in the record as a whole and whether the Commissioner's conclusions are based upon an erroneous legal standard. *See Green-Younger v. Barnhart*, 335 F.3d 99, 105-106 (2d Cir. 2003).

## II. <u>Relevant Medical Evidence</u>

The relevant period began when plaintiff was admitted the emergency department following a motor vehicle accident on April 18, 2006, and he reported severe pain in his left-side chest and pelvic areas and his neck, and was diagnosed with a left-sided rib fracture. T. 262-266, 275, 277-279, 281. Upon discharge, plaintiff was prescribed Percocet for his pain and cleared to return to work in one week. T. 284

Plaintiff was treated by several doctors at the Big Flats Clinic from April 26, 2006 to October 25, 2006. T. 289-302. Despite having consistent low back pain throughout most of his treatment, with periodic complaints of nose, jaw, chest, neck, left hand, left ankle and right foot pain and a right inguinal hernia diagnosis, by October 11, 2006, plaintiff reported that he was "starting to feel better" with occasional discomfort in the shoulder, tingling in the hands, and tightness in the low back. T. 290-302. He was engaging in "more of his activities of daily living successfully." T. 290. On October 26, 2006, plaintiff had "stable complaints," including right trapezius and low back pain

4

with morning spasms upon waking. T. 289.  On June 30, 2006, Dr. Carlos Garcia noted that plaintiff was very anxious and agitated and that although he complained of being in great pain, plaintiff was not compliant with his medication, he skipped his appointment with the orthopedic doctor, and he did not return to the clinic for month. T. 297.  X-ray imaging of plaintiff's spine revealed "degenerative changes at the L5/S1 level with narrowing of the disc space as well as sclerosis of the vertebral bodies, most likely on a degenerative basis." T. 303-304  On July 20, 2006, plaintiff was again "highly agitated," but had "essentially no complaints." T. 295.  He reported mowing his lawn for two to three hours and doing minor household repairs, which aggravated his back discomfort. T. 295.

On July 26, 2006, treatment notes reveal that plaintiff had improved in the cervical thoracic region and was stable in the low back area. T. 295.  On August 9, 2006, plaintiff's primary complaint was hand stiffness and that he was not able to use his hands. T. 293.  Dr. George Pokorny, an orthopedic surgeon, noted, however, that plaintiff's hands were soiled with dirt under his nails and he was freely moving his wrists and digits and exhibited normal range of motion bilaterally. T. 293.  With some exceptions, plaintiff's condition continued to improve through the end of his treatment. T. 289-292.

On February 22, 2007, plaintiff underwent an orthopedic examination that revealed a nondisplaced left distal tibial fracture and nondisplaced left talar neck fracture. T. 308. Plaintiff was placed in a short leg cast, instructed to remain non-weight bearing, and prescribed Vicodin. T. 308-310. By April 26, 2007, the fractures appeared healed and the cast was removed. T. 316. In November 2009, plaintiff was examined by Dr. Edward Clarke concerning his inguinal hernia. T. 318-320. Plaintiff agreed to proceed with surgery if his condition became more symptomatic, but he never called or responded to a message from Dr. Clarke's office to schedule surgery. T. 317.

On May 12, 2011, plaintiff underwent an internal medical examination by Dr. Look Persaud, M.D. at the request of the Commissioner. T. 329-334. Plaintiff reported pain "on and off" in both wrist with some stiffness and numbness, but he did not recall receiving any specific treatment or having any recent diagnostic studies of his wrists and hands. T. 329. Plaintiff also complained of constant, sometimes severe pain in his neck, left rib cage, and left upper extremity. T. 329. Plaintiff reported cooking ten times a month, dressing daily, and grocery shopping two to three times a month. T. 331. His other activities and hobbies included watching tv, socializing with friends, playing guitar, sailing and collecting models. T. 331. Dr. Persaud's examination revealed that plaintiff exhibited: limited painful range of motion of the

6

cervical spine and the thoracolumbar spine to varying degrees; full range of motion of the shoulders, elbows, forearms, and wrists bilaterally; 5/5 strength in the upper and lower extremities; and intact hand and finger dexterity with 5/5 grip strength bilaterally. T. 332-333.

Dr. Persaud diagnosed plaintiff with (1) stiffness and weakness in the hands and fingers with possible bilateral carpal tunnel syndrome, (2) history of pain in the neck, left rib cage, and left upper extremity, and (3) intermittent bilateral foot pain. T. 333.  The prognosis was "fair to guarded" for plaintiff's bilateral wrists, left wrist, neck, and left upper extremity, and fair for his intermittent bilateral foot pain. T. 333. Dr. Persaud opined that plaintiff has no restrictions sitting and standing, walking on even or uneven terrain  and up inclines, ramps and stairs, kneeling, crawling, reaching, in fine motor activity of hands, speaking, hearing, seeing, and traveling by public transportation. T. 333-334.  Plaintiff has mild restriction squatting, bending, twisting, and turning. T. 333. He has moderate restriction lifting, carrying, pushing, and pulling due to his bilateral wrist and hand, neck, left upper extremity and low back problems. T. 334.

Medical records from December 2011 to September 2012 reveal that plaintiff was treated by Dr. Sam Thompson for complaints of chest, shoulder, and neck pain and sporadic weakness in his arms

and legs. T. 385-387.   Plaintiff's physical examinations were generally normal apart from chest tenderness, and plaintiff was assessed with muscle weakness, chest pain, and borderline hypertension. T. 386-394, 396-398.   April 2011 x-rays revealed generative disc narrowing and spondylosis in plaintiff's cervical spine at C5-C6 and C6-C7 and a chronic fracture of his left fifth rib. T. 400-401.   Dr. Thompson opined that plaintiff could sit or stand and walk for two hours in an eight-hour workday in a job that permitted position shifting at will and unscheduled breaks. T. 423. Plaintiff could occasionally lift and carry 20 pounds and occasionally twist and stoop, but he had significant limitations in reaching, handling, or fingering, although he refused testing or surgical treatment for his alleged carpal tunnel syndrome. T. 423. Plaintiff would be absent for more than four days per month due to his impairments. T. 423.

With respect to his mental health, on March 23, 2011, plaintiff underwent a psychiatric evaluation performed by Dr. Albert Chen, his treating physician from February 2009 to March 2012. T. 377-378, 379-383.   Plaintiff's reported history included physical and verbal abuse in the Marines and, as a result, he suffered a linear fracture of the tibia and fibula. T. 377.   He reported that he was also subjected to an attempted sexual assault by two sergeants at knife point. T. 377.   After being discharged

from the military, plaintiff abused alcohol and marijuana and was repeatedly arrested for domestic violence. T. 377.

Dr. Chen's examination revealed that plaintiff was hyper vigilant, guarded, cynical, nervous, and fidgety, with outbursts of rage caused by small conflicts. T. 378.  His thought processes were otherwise coherent and goal-directed with logically-connected speech and no delusional, grandiose, or paranoid thinking. T. 378. Plaintiff was susceptible to bouts of depression, and his capacity for impulse control was compromised. T. 378.  Dr. Chen opined, among other things: that plaintiff's sensorium was intact; his remote and recent memory was good; he was able to perform simple calculations with reasonably good focus and concentration; he had an adequate fund of information, an average IQ, insight into his problem, and marginally fair judgment. T. 378.  Dr. Chen diagnosed plaintiff with PTSD, depressive disorder, and a history of alcohol and substance abuse with a GAF score of 50. T. 378.  It was noted that plaintiff was taking Celexa and Seroquel and would continue outpatient psychotherapy. T. 378.  As part of his mental residual functional capacity questionnaire, Dr. Chen opined that plaintiff was seriously limited from maintaining regular attendance and punctuality, completing a normal workday and workweek without psychology-based symptom interruptions, and getting along with coworkers without unduly distracting them or exhibiting behavior. T. 384.  He further opined that plaintiff was unable accept

9

instructions or appropriately respond to criticism from supervisors at a competitive level. T. 384. Plaintiff would, on average, miss about four days of work per month due to his impairments. T. 384. Plaintiff was, however, able to satisfactorily maintain attention for two hours, work with and around coworkers without being unduly distracted, and deal with normal work stress. T. 384.

Plaintiff underwent another psychiatric evaluation on May 12, 2011, which was performed by Dr. Sara Long. T. 324-325. Dr. Long noted that plaintiff, who drove himself 18 miles to the evaluation, had no history of psychiatric hospitalizations and was not currently in treatment. T. 324. Plaintiff reported having problems with PTSD, anger, and controlling his emotions, and he advised Dr. Long that he was stabbed, beaten, and sexually abused when he was in the military. T. 324. Plaintiff had a legal history of domestic violence and assault, including assault-related criminal charges in 2009. T. 325. Dr. Long noted that plaintiff was cooperative with good social skills, well-groomed with appropriate eye contact, coherent and goal directed, angry about his car accident, but able to calm himself, and "functioning on an average intellectual level with a good fund of information," but that his insight and judgment were poor T. 326.

Dr. Long opined that plaintiff was able to: follow and understand simple instructions and perform simple tasks independently; maintain attention, concentration, and a regular

schedule; learn new tasks, perform some complex tasks independently, and make appropriate decisions in context; relate adequately with others, but he would benefit from additional skills; and generally deal with low-level stress. T. 326. Although Dr. Long opined that plaintiff had psychiatric problems that may, at times, interfere with his ability to function on a regular basis, with appropriate psychotherapy and the availability of productive interventions when symptoms are reported, his "[p]rognosis [was] good to alleviate anger." T. 327. Dr. Long diagnosed plaintiff with impulse control disorder and did not rule out borderline personality disorder or PTSD. T. 327.

A May 2011 psychiatric review technique form completed by Dr. Apacible provided an assessment of plaintiff's alleged mental health impairments, PTSD and possible impulse control disorder and borderline personality disorder, for Listings 12.06 and 12.08. T. 335-352. Dr. Apacible found that plaintiff had no marked limitations in his activities of daily living or maintaining social functioning, concentration, persistence, or pace. T. 345. Plaintiff had no repeated, extended episodes of deterioration, and there was no evidence to establish the presence of the "C" criteria. T. 15. In his mental residual functional capacity assessment, Dr. Apacible found only two areas in which plaintiff was moderately limited, understanding and remembering detailed instructions and carrying out detailed instructions. T. 349.

Dr. Apacible opined that plaintiff was able to perform the "basic demands of competitive, remunerative unskilled work on a sustained basis," possibly in a setting where he does not have to work closely with others. T. 351.

### III. <u>Non-Medical Evidence</u>

Plaintiff, 49 years old, testified that he obtained his GED and spent three years in the Marines. T. 33, 36.  He had been in treatment with psychiatrist Dr. Chen "off and on" since "'93 or '94" for trauma related to his military experience. T. 36, 48. He took Seroquel and previously took Cymbalta, Zoloft, and Paxil. T. 49.  Plaintiff was ambivalent about whether the medications were effective. T. 49.  Plaintiff cried "a lot," staying in bed for days on occasion, experienced nightmares and "night sweats" as a result of his PTSD. T. 55-56.  He typically slept for two to three hours "at the most." T. 56.

After leaving the service, plaintiff was employed in salvage and rescue for four years and then carpentry and electrical work until he became licensed to sell insurance, which he did for almost 13 years. T. 38.  When plaintiff lost his insurance license as a result of personal problems, he worked as a construction laborer until when he was injured in the first car accident. T. 40-41, 42.

As a result of the accident, plaintiff sustained injuries to his knee, neck, shoulder, and back, but after getting into an argument with his doctor, plaintiff "never went back to see him."

T. 41.  Plaintiff further testified: "I've never gotten along with any doctor yet." T. 41.  Aside from an incident with one of his employers and violent attacks on his brother for whom he worked for a period, plaintiff "tried to contain" himself at work. T. 62-63. Although plaintiff returned to work, he was involved in a second car accident in 2006 in which he sustained severe injuries to his back, neck, ribs, wrists, and ankles. 41-43.  He has been unemployed since that time.

Plaintiff testified that he currently experiences "severe" pain in his chest, stating:

> I always feel like I'm having a heart attack and I can't lift anything . . . if I do work, it gets really severe. I have to go sit.  And then I still have wrist[] and ankle problems . . . [M]y legs give out and I fall down and get hurt, and I still have severe lower back and severe upper neck and shoulder, and my arms are ripped out of their sockets so bad I can't lift them.

T. 43.

Plaintiff describes his pain level as a seven or eight on a scale of one to ten, and he takes "Tramadol" as prescribed by Dr. Thompson "when he can't stand the pain," although it irritates his stomach. T. 44-45, 50, 54.  Plaintiff also sustained a left leg fracture after falling from a roof three years prior to the hearing, and he was diagnosed with a hernia and carpal tunnel syndrome. 45-47.  On a scale of one to ten, the pain level in plaintiff's wrists was at eight "[a]ll the time" and sometimes ten, when he "can't do anything." T. 48.  Plaintiff cannot sit for

13

longer than "an hour or two" due to pain in his lower back, neck, and shoulders. T. 61    With respect to his daily life, plaintiff testified that he can carry 20-pound bundles of wood, split by his son, for "about an hour" and operated a riding lawn mower for an hour, but that it hurts his ribs, back, or wrists. T. 52-53, 55. Aside from visiting his father once a week in the summer, plaintiff stays at home because he is "scared to drive."  Plaintiff further testified that he "was suicidal most of [his] life." T. 56, 61. Plaintiff, who briefly earned income from a rental property, lives with his girlfriend, a cashier at a Rite Aid drugstore. T. 57-58. In 2007, plaintiff worked at a pizza place three nights a week. T. 59-60.  On a typical day, plaintiff spends time repairing his house and barn roofs, which were damaged during a tornado, and he sees Dr. Chen about once a month. T. 59.  He also plays guitar when his hands do not hurt, and he visits with friends. T. 61.

## IV. **The Commissioner's Decision Denying Benefits is Supported by Substantial Evidence.**

### A. **The ALJ properly considered plaintiff's alleged carpal tunnel syndrome.**

Plaintiff contends that the ALJ erred by failing to find that his carpal tunnel syndrome was a severe impairment. Plaintiff's memorandum of law, p. 9. Defendant responds that the ALJ properly evaluated plaintiff's severe impairments at step two of the sequential analysis. Defendant's memorandum of law, p. 19-21.

For an impairment to be severe, it must significantly limit plaintiff's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 416.921(a).  It must be established by medically-acceptable clinical or laboratory diagnostic techniques demonstrating the existence of a medical impairment, not by plaintiff's subjective complaints alone. *See Ornelas-Sanchez v. Colvin*, 2014 WL 5361947, at *4 (W.D.N.Y.2014); 42 U.S.C. § 423(d)(3); 20 C.F.R. § 416.908.  Moreover, "the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" *Barone v Colvin*, 2015 WL 1886883, at *6 (W.D.N.Y.2015), quoting *Coleman v. Shalala*, 895 F.Supp. 50, 53 (S.D.N.Y.1995).

Here, at step two of the sequential analysis, the ALJ expressly considered plaintiff's history of carpal tunnel syndrome and noted that, in addition to the evidence failing to establish that the condition lasted for a continuous 12-month period, as plaintiff complained to a treating source that he was unable to use his hands, he was freely moving his wrists and digits and his range of motion in the wrist bilaterally was essentially normal. T. 15.

Plaintiff's allegation of error based on the ALJ's failure to consider his carpal tunnel syndrome as a severe impairment is not supported by a plain reading of the ALJ's analysis at step two or a review of the evidence in the record.  Although plaintiff alleges

that "[r]egardless of the actual diagnosis," he "suffers from a recognized condition that causes pain, stiffness and resulting limitations in his hands and fingers" (plaintiff's memorandum of law, p. 7), the record evidence pertaining to his alleged carpal tunnel syndrome is insufficient to establish a severe impairment. Plaintiff began complaining of tingling or stiffness in his hands in 2006, but there was no evidence that it affected his ability to do work-related or daily activities in any way. T. 289-291.  As noted by the ALJ, plaintiff's complaints about his hands and wrists were, at times, starkly at odds with clinical observations, and it was noted throughout the record that plaintiff was frequently noncompliant with, and sometimes resistant to, treatment. T. 293, 297, 309, 317, 329.

In 2011, plaintiff reported some numbness and stiffness in both wrists, with pain "on and off," but he had never been treated or evaluated diagnostically. T. 329.  Dr. Persaud  opined that plaintiff had full range of motion of his wrist and intact hand and finger dexterity and strength, and he assessed no limitations in reaching or fine motor activities of the hands. T. 332-333. Although Dr. Thompson opined that plaintiff had significant limitations reaching, handling, or fingering, he noted that plaintiff refused to be tested for carpal tunnel syndrome. T. 423. Plaintiff regularly carried 20-pound bundles of wood, operated his riding lawn mower, drove a car, made house repairs, played guitar,

16

visited with friends and family, and engaged in basic daily living activities. T. 52-61, 324.

Based on the foregoing record evidence, plaintiff has failed to establish a diagnosis of carpal tunnel syndrome or demonstrate what effect the specific symptoms of this condition has on his ability to perform basic work activities.  Moreover, contrary to plaintiff's assertion, the ALJ considered all of plaintiff's impairments in the RFC assessment and considered limitations related to his wrists and hands. T. 18.  The ALJ specifically noted records from Dr. Thompson and Dr. Persaud pertaining to possible symptoms of carpal tunnel syndrome during the written analysis of the RFC finding. T. 18-19.  Finally, even if the ALJ had found plaintiff's alleged carpal tunnel syndrome to be a severe impairment, that would not require limitations on his ability to perform basic work activities at Step Four. *See Burkstrand v. Astrue*, 346 Fed.Appx 177, 180 (9th Cir.2009).

## B. The RFC Assessment

Plaintiff also challenges the ALJ's determination that plaintiff had the RFC to perform light work with the following limitations: lift and carry up to 20 pounds occasionally and 10 pounds frequently; sit for at least six hours in an eight-hour work day and stand or walk for at least six hours in an eight-hour work day; crouch and stoop occasionally; and contact with supervisors occasionally.  T. 16.

"It is well-settled that 'the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Hogan v. Astrue*, 491 F.Supp.2d 347, 354 (W.D.N.Y. 2007), quoting Social Security Ruling 96-8p, 1996 WL 374184, at *7 (S.S.A. 1996), citing *Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir. 1998). In this case, after setting forth plaintiff's RFC, the ALJ summarized most of the medical evidence in the record, including treatment notes from plaintiff's medical providers from 2006 to 2012 in which he detailed plaintiff's treatment history. The ALJ discussed how the medical evidence to which he referred and relied upon supported his conclusion that plaintiff could perform sedentary work with the referenced limitations.

Plaintiff first asserts that the ALJ's RFC is flawed because the ALJ failed to afford controlling weight to the opinions of Dr. Thompson and Chen in accordance with the treating physician rule and failed to properly weight the opinion of Dr. Long. Plaintiff's memorandum of law, p. 20. Defendant responds that the ALJ properly weighed those opinions in accordance with the medical evidence in the record. Defendant's memorandum of law, p. 21-28.

With respect to the treating physician rule, the medical opinion of plaintiff's treating physicians or psychiatrists will be given "controlling" weight if their opinions are "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Green-Younger*, 335 F.3d at 106.  Medically acceptable clinical and laboratory diagnostic techniques include consideration of "'a patient's report of complaints, or history, [a]s an essential diagnostic tool.'" *Id.*, 335 F.3d at 107, quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir.1997).

A corollary to the treating physician rule is the so-called "good reasons" rule, which provides that the Commissioner "'will always give good reasons in its notice of determination or decision for the weight it gives [plaintiffs's] treating source's opinion.'" *Clark v. Commissioner of Social Sec.*, 143 F.3d 115, 118 (2d Cir.1998), quoting 20 C.F.R. §§ 404.15279(d)(2), 416.927(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific.'" *Blakely v. Commissioner of Social Sec.,* 581 F.3d 399, 406 (6th Cir. 2009), quoting Social Security Ruling 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996).  Insomuch as the "good reasons" rule exists to "ensur[e] that each denied claimant receives fair process" (*Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 243 [6th Cir. 2007]), an ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a*

*lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakely*, 581 F.3d at 407, quoting *Rogers*, 486 F.3d at 243.

Here, plaintiff challenges the ALJ's statement that Dr. Thompson's medical source statement was "clearly based on claimant's self-report and not on objective evidence." T. 18. Dr. Thompson assessed plaintiff with muscle weakness, chest pain, and borderline hypertension. The Court finds that there is substantial evidence in the record for the ALJ to have concluded that, based on his treatment notes, Dr. Thompson's opinion that plaintiff could sit or stand and walk for only two hours in an eight-hour day in a job that permits movement at will and unscheduled breaks was not based on objective evidence and is inconsistent with the record as a whole. Plaintiff similarly asserts that the ALJ erred in failing to give Dr. Chen's opinion controlling weight. The ALJ specifically states that Dr. Chen's opinion "is not supported by the psychiatrist's own sparse treatment notes or the record as a whole." T. 20. Indeed, Dr. Chen found that: plaintiff's sensorium was intact; his remote and recent memory was good; he was able to perform simple calculations with reasonably good focus and concentration; he had an adequate fund of information, an average IQ, insight into his problem, and marginally fair judgment; and his thought processes were coherent and goal-directed. T. 378. Dr. Chen also found that plaintiff was guarded, cynical, susceptible to

20

bouts of depression with compromised impulse control, and had outbursts of rage. T. 378.  Dr. Chen's conclusions, however, that plaintiff was seriously limited from maintaining regular work attendance, punctuality, behaving appropriately with coworkers, and completing a normal workday without psychologically-based symptoms interruptions (T. 384), are not, as noted in the ALJ's decision, sufficiently supported by his own treatment notes, which contain little objective evidence to support the imposition of such significant limitations.  T. 379-383.

The Court finds that there is substantial evidence in the record to support the ALJ's decision to accord less weight to the opinions of Dr. Thompson and Dr. Chen.

The Court further finds that plaintiff's final challenge to the RFC, that the ALJ erred at step five by failing to consult a vocational expert, is without merit.  Plaintiff specifically asserts the ALJ did not properly account for the significant non-exertional limitations resulting from his mental impairments. Plaintiff's memorandum of law, p. 20-22.  Defendant responds that plaintiff's mental impairments were not so severe as to create significant non-exertional limitations requiring the testimony of a VE. Defendant's memorandum of law, p. 29-30.

"In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2

21

(1986)." *Roma v Astrue*, 468 Fed.Appx. 16, 20 (2d Cir.2012) (internal quotation marks and citations omitted).  Although exclusive reliance on the grids may be inappropriate where plaintiff's significant nonexertional impairments limit the range of work that he can perform, "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Id*. at 21 (internal quotation marks omitted).

Here, the ALJ relied solely on the Grid, finding that the additional limitation of occasional contact with supervisors has "little or no effect on the occupational base of unskilled light work" and that "[t]here are numerous jobs in the national economy at the light and sedentary level that will accommodate the limitation." T. 21.  In light of this finding, the ALJ "was not required to seek testimony from a vocational expert." *Wasiewicz v. Colvin*, 2014 WL 5465451, at *6 (W.D.N.Y.2014). Consequently, the Court finds no error in the ALJ's step- five analysis.

Based on the foregoing, and a review of the record in its entirety, the Court finds that the ALJ's determination is supported by substantial evidence.

### CONCLUSION

The ALJ's decision denying plaintiff's claims for SSI and DIB is supported by the substantial evidence in the record. The plaintiff's motion for judgment on the pleadings is therefore

denied, and defendant's cross-motion for judgment on the pleadings is granted.   The complaint is dismissed in its entirety with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

S/ MICHAEL A. TELESCA
HONORABLE MICHAEL A. TELESCA
UNITED STATES DISTRICT JUDGE

DATED: June 23, 2015
       Rochester, New York